1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH JOHANSEN,

                    Plaintiff,

     v.

EFINANCIAL LLC,

                  Defendant.

CASE NO. 2:20-cv-01351-RAJ-BAT

**REPORT AND
RECOMMENDATION**

11
12
13
14
15
16
17
18
19
20

     Defendant Efinanical LLC ("Efinancial") moves for summary judgment pursuant to Fed. R. Civ. P. 56 on Plaintiff Kenneth Johansen's claim that Efinancial violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227 *et seq*. Dkt. 24. Plaintiff filed his Complaint on behalf of himself and all others similarly situated and alleges that Efinancial violated the TCPA by placing telephone calls to him and the putative class members whose telephone numbers are on the National Do-Not-Call ("DNC") Registry in violation of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c). Dkt. 1, ¶¶ 34–35. Efinancial contends that it is not liable for the one telephone call at issue in this case because it had express permission to telephone Plaintiff. Alternatively, Efinancial contends that it is entitled to TCPA's safe harbor provision. Dkt. 24.

21
22
23

     Plaintiff contends that Defendant's business practices apply to and affect the members of the putative class uniformly and Defendant's purported consent to call Plaintiff will be common for the entire proposed class, which Plaintiff describes as including "only persons from whom

Defendant claims to have obtained consent to call in the same manner Defendant claims to have obtained consent to call Plaintiff." Dkt. 1, p. 5. On December 4, 2020, the Court entered an order bifurcating discovery on Plaintiff's individual claim and class discovery. Dkt. 21. On April 16, 2021, Efinancial's motion for summary judgment was filed. Presently at issue are two telephone calls placed by Efinancial, only one of which could subject Efinancial to liability under the TCPA. *See* 47 U.S.C. § 227(c)(5) (creating a private right of action under the TCPA after receipt of *more than one* telephone call within a 12-month period in violation of the regulations).[1]

Plaintiff filed a response in opposition to the motion for summary judgment. Dkt. 36; *see also* Dkt. 38 (EFinancial's Reply). Having carefully reviewed the parties' briefs, declarations in support and opposition, and balance of the record, the undersigned has determined that oral argument is not necessary and recommends that EFinancial's motion be **granted**.

FACTS

A.    Efinancial's Policies and Procedures

Efinancial is an insurance agency that offers life insurance policies. Dkt. 24, Declaration of Marie Boisseau, Marketing Operations & Compliance Manager ("Boisseau Decl."), ¶ 5. Efinancial has established and implemented written procedures to ensure compliance with the DNC rules, and those written procedures were in place in April 2020. *Id*., ¶ 6; *id.*, Ex. D. Specifically, Efinancial maintains an Annual Teleservices Compliance Training, which includes those procedures and is provided to all Efinancial personnel who participate in telephone work on behalf of Efinancial and their managers. *Id.*, Boisseau Decl., ¶ 7. The presentation explains what the National DNC Registry is and its purpose. *Id.*, Boisseau Decl., Ex. D at 7. The

---

[1] Efinancial called Plaintiff twice at his request after April 7, 2020, to discuss Plaintiff's TCPA allegations. These calls are not at issue in this litigation.

REPORT AND RECOMMENDATION - 2

1  presentation also explains how to identify do-not-call requests and, on a slide titled "DNC

2  Compliance," what to do when a do-not-call request is made. *Id.*, ¶¶ 8-11.

3       Efinancial uses this training guide to train personnel on compliance with these

4  procedures. Dkt. 25, Boisseau Decl., ¶ 8. All customer-facing Efinancial employees and their

5  direct supervisors are required to participate in this training and be certified in teleservices

6  compliance. *Id.*, ¶ 9. Efinancial personnel receive this training at the start of their employment

7  prior to any telephone communications with customers. *Id.*, ¶ 10. After completing the training,

8  the employees are required to take a test on teleservices compliance and pass with a grade of

9  80% to receive their certification that they have successfully completed the training and passed

10 the test. *Id.*, ¶ 11.[2] Upon passing the test, the employee is certified and can begin communicating

11 by telephone with customers. *Id.* Employees are given three attempts to pass the test, and if an

12 employee exceeds three attempts, he will receive one-on-one live training from a manager before

13 a final attempt to obtain certification. *Id.*, ¶ 12. Employees must complete this training annually

14 or any time there is a change in regulations, systems, or protocols. *Id.*, ¶ 13.

15       Efinancial also maintains in its database a list of telephone numbers that its

16 representatives may not contact. Dkt. 25, Boisseau Decl., ¶ 14. When a customer indicates that

17 she or he no longer wants to receive calls from Efinancial, the customer's information in

18 Efinancial's Automated Life Insurance Sales System ("ALISS") is changed to "Dead File – Do

19 Not Call" or the information is immediately noted as DNC in Efinancial's Interactive

20 Intelligence System. *Id.*, ¶ 15; *see also id.*, Boisseau Decl., Ex. C (showing Plaintiff's

21 information as "Dead File" in Efinancial's database, meaning he is currently on Efinancial's

22

23

---

[2] Exhibit D states that a 90% grade is required but the policy has since changed. Dkt. 25, Boisseau Decl., ¶ 11.

DNC list). The DNC designation ensures the person is not called again. *Id.*, Boisseau Decl., ¶ 16.

Efinancial also has a process to prevent calls to any telephone number on any list established pursuant to the DNC rules by ensuring that it has consent to call its customers. Dkt. 25, Boisseau Decl., ¶¶ 17-18. Efinancial receives requests for life insurance through online landing pages where customers enter their contact information and request information from Efinancial about life insurance policies and to obtain a life insurance quote. *Id.* at ¶ 19. To submit an online request for information, the customer must provide consent to be called by Efinancial.[3] *Id.* Efinancial does not purchase data or lists containing consumer information that could belong to a customer who did not provide consent to be called by Efinancial. *Id.* at ¶ 21. Therefore, any request for information that Efinancial receives necessarily includes consent for Efinancial to call that customer. *Id.*, ¶ 22. Efinancial does not accept a request for life insurance information, a life insurance quote, and the customer's accompanying information, if the request does not include a flag that consent to be called was provided by the customer (unless that customer has called Efinancial directly themselves). *Id.*, ¶ 23.

Efinancial does not sell, lease, or use the National DNC Registry for any improper purpose. Dkt. 25, Boisseau Decl., ¶ 24. Efinancial also does not share the cost of accessing the National DNC Registry with other entities. *Id.*, ¶ 25. These practices and procedures are all part of Efinancial's routine business practice and were in place in April 2020. *Id.*, ¶ 26.

B.    Plaintiff's Registration on National DNC Registry

Plaintiff attests that he registered his residential telephone number with the National DNC Registry in July of 2001. Dkt. 37, Declaration of Kenneth Johansen, ¶ 2.

---

[3] Alternatively, a customer may call Efinancial directly for these services, which telephone call would naturally not require prior consent. Dkt. 25, Boisseau Decl., ¶ 20.

REPORT AND RECOMMENDATION - 4

C.   <u>Request for a Life Insurance Quote</u>

On April 6, 2020, Efinancial received information purportedly from Plaintiff on its website, https://feprogressive.efinancial.com.[4] Dkt. 25, Boisseau Decl. ¶ 27; *id.*, Ex. A. To submit a quote request on this website, the customer must enter his or her first and last name, gender, date of birth, zip code, phone number, and email address, and must also consent to be called by Efinancial. *Id.*, Boisseau Decl., ¶ 32. The data for height, weight, tobacco use, term, and coverage that appears on this submission was temporarily auto-populated by Efinancial after the information was submitted. Dkt. 25, Boisseau Decl., ¶ 34. This information is adjusted later by the Efinancial representative who speaks to the customer. *Id.*

Efinancial received Plaintiff's information with a "Vendor Source" code that shows which website was used to submit the information. Dkt. 25, Boisseau Decl., ¶¶ 30-31. The "Vendor Source" code accompanying Plaintiff's information is associated with https://feprogressive. efinancial.com, thus confirming that the information was submitted through this website. *Id.*, ¶ 31. The following notice appears on the website below the button used to submit information to Efinancial:

> Efinancial, LLC provides quotes from Fidelity Life and other insurers on this site. These entities are not affiliated with Progressive. By pressing the button above you agree to this website's Privacy Policy, and you consent to receive offers of insurance from Efinancial, LLC at the email address or telephone numbers you provided, including autodialed, pre-recorded calls, SMS or MMS messages. Message and data rates may apply. You recognize and understand that you are not required to sign this authorization in order to receive insurance services from eFinancial and you may instead reach us directly at (855) 627-1882.

*Id.*, ¶ 35.

---

[4] Progressive's name is in the website URL because it is an affinity partner working with Efinancial to offer a co-branded experience for obtaining a life insurance quote. But Efinancial owns the website. Dkt. 25, Boisseau Decl. ¶ 28.

REPORT AND RECOMMENDATION - 5

In the screenshot of the submission with Mr. Johansen's information, "ewcautodial_fla," "ewcprerecorded_fla," "ewcemail_fla," ewcsms_fla," and ewcmms_fla" are all populated as "true," meaning that the information was provided with consent to receive autodialed calls, prerecorded calls, emails, SMS messages, and MMS messages. *Id.*, ¶ 36.

After receiving Plaintiff's information, Efinancial placed two telephone calls to Plaintiff. *Id.* ¶ 37. Efinancial attempted to call him on April 6, 2020, but no one answered. *Id.*, ¶ 39; Boisseau Decl., Ex. B. Efinancial called Plaintiff again on April 7, 2020, at which time Plaintiff answered. *Id.* This telephone call was recorded by Efinancial. Dkt. 28, Declaration of Terance A. Gonslaves, Ex. A (Certified Transcript of April 7, 2020 Phone Call Transcript ("Tr.")). The call lasted approximately 27 minutes. Dkt. 25, Boisseau Decl., ¶ 42. During the call, Plaintiff spoke to two Efinancial representatives, Mr. Robert Zamora, a former Efinancial Business Development Representative, and Ms. Baljeeet "Tina" Mangat, an Efinancial Account Executive. *Id.* ¶ 41.

   1.   Background Information Regarding Mr. Zamora and Ms. Mangat

Mr. Zamora worked for Efinancial from July 2019 to July 2020. Dkt. 26, Declaration of Robert Zamora ("Zamora Decl."), ¶ 2. At the time of the April 7, 2020 telephone call to Plaintiff, Mr. Zamora was a Business Development Representative for Efinancial. *Id.*, ¶ 3. His job responsibilities involved communicating on the telephone with customers who submitted online requests for information regarding life insurance. *Id.* At the beginning of his telephone conversations with customers, Mr. Zamora received on his computer the information the customers provided about themselves when they submitted their request to receive life insurance information from Efinancial. *Id.*, ¶ 4. That information includes the customer's name, gender, date of birth, zip code, phone number, email address, and any other information that the

1    customer included in the request. *Id.* During his conversation with customers, Mr. Zamora

2    verified the basic personal information the customer provided to Efinancial, and at times, he

3    would request additional personal information related to the customer's request for information

4    regarding life insurance policies. *Id.*, ¶ 5. After speaking with the customer and verifying the

5    basic information the customer provided to Efinancial online and confirming the customer's

6    interest to receive information regarding life insurance policies, Mr. Zamora would transfer the

7    customer to an Efinancial Account Executive, who can provide the customer detailed

8    information about available life insurance policies and the premiums for those policies. *Id.*, ¶ 6.

9    When Mr. Zamora was hired by Efinancial, he received training on teleservices compliance,

10   which included training regarding the TCPA and the Do Not Call regulations, among other

11   teleservice compliance topics. *Id.*, ¶ 7. The training included the same topics in the Annual

12   Teleservice Compliance Training attached as Exhibit D to the Declaration of Marie Boisseau.

13   *Id.*, ¶ 8. After completing this training, Mr. Zamora took and passed a certification test on

14   teleservices compliance before he had any telephone communications with customers over the

15   phone. *Id.*, ¶ 9. He received his teleservices compliance certification on July 29, 2019 and had

16   access to this Annual Teleservice Compliance Training during his employment at Efinancial and

17   could review it at any time. *Id.*, ¶¶ 10-11.

18         Ms. Mangat began working for Efinancial in October 2019 and is currently employed at

19   Efinancial as an Account Executive, a position she has held since April 2020. Dkt. 27,

20   Declaration of Baljeet Mangat, ¶¶ 2-3. Ms. Mangat's job responsibilities involve talking to

21   customers on the telephone about their life insurance needs, asking them questions about their

22   health and lifestyle, providing them life insurance quotes, and submitting insurance applications

23   on their behalf. *Id.*, ¶ 4. Ms. Mangat speaks with customers after they speak with a Business

Development Representative about basic pre-qualifying personal information. Dkt. 27, Mangat Decl., ¶ 5. The Business Development Representative – in this case, Mr. Zamora – transfers the call to an Account Executive — in this case, Ms. Mangat — if the customer continues to be interested in obtaining information about Efinancial's life insurance policies. *Id*.

When the call is transferred, Ms. Mangat receives certain information that the customer provided to Efinancial in the customer's online form and from the customer's telephone call with the Business Development Representative. Dkt. 27, Mangat Decl., ¶ 6. That information normally includes the customer's name, gender, date of birth, zip code, phone number, and email address. *Id*. Sometimes the information also includes answers to the questions asked by the Business Development Representative during the initial pre-screening telephone call, such as the customer's address; whether the customer uses tobacco; whether the customer has been treated for cancer, heart disease, stroke, HIV/AIDS, or dementia; and whether the customer is confined to a nursing home or diagnosed as terminally ill. *Id*.

At the beginning of the call, Ms. Mangat normally introduces herself and provides background information on Efinancial. *Id*., ¶ 7. Then she asks the customer about their insurance needs and a series of health and lifestyle questions. *Id*. The health and lifestyle questions include include questions regarding health conditions like high blood pressure, cancer, diabetes, depression, anxiety, sleep apnea, and epilepsy; recent hospitalizations or doctor visits; prescriptions for medicine; the customer's job and household income; dangerous hobbies; traffic violations or charges for driving under the influence or reckless driving; drug and alcohol abuse; felony convictions; and bankruptcy. *Id*. After obtaining this information, Ms. Mangat generates an insurance quote and provides the customer with the amount of the monthly premium on a life insurance policy. *Id*., ¶ 8. If the customer wants to enroll in the policy, Ms. Mangat submits the

customer's application using the information that she collected during the call. *Id*.

Ms. Mangat received training on teleservices compliance, which included training regarding the TCPA, the Do Not Call regulations, and other teleservice compliance topics. Dkt. 27, Mangat Decl., ¶ 9. The training she received included the same topics in the Annual Teleservice Compliance Training attached as Exhibit D to Ms. Boissau's declaration (Dkt. 25). *Id*., ¶ 10. After taking the training, Ms. Mangat took and passed a certification test on teleservices compliance before she had any communications with customers over the phone. *Id*., ¶ 11. She received her teleservices compliance certification on October 17, 2019, and her second annual certification was delayed due to COVID-19. *Id*., ¶ 12. Ms. Mangat has access to this Annual Teleservice Compliance Training and can review it at any time. *Id*., ¶ 14.

2.   April 7, 2020 Telephone Call with Efinancial

During the April 7, 2020 call, Plaintiff first spoke to Mr. Zamora, who immediately identified himself as an Efinancial representative who was calling in response to a life insurance request submitted by Plaintiff. Dkt. 28, Gonslaves Decl., Ex. A, Tr. 2:1–8. Mr. Zamora asked Plaintiff to confirm information that Plaintiff submitted with his life insurance request, including his date of birth, zip code, and email address. *Id.*, Tr. 2:9-3:16. Plaintiff confirmed that the information was correct. *Id*. Mr. Zamora also asked Plaintiff for his address, which Plaintiff provided, and then asked several questions about Plaintiff's medical and criminal history. *Id.*, Tr. 2:22-4:8. During this interaction, Plaintiff answered all of Mr. Zamora's questions, made no objections, and never protested that Efinancial did not have his consent to telephone him. *See generally id.*, Tr. 2:1-4:9. Mr. Zamora then transferred Plaintiff to Ms. Mangat to obtain a life insurance quote. *Id.*, Tr. 4:9-16; Dkt. 26, Zamora Decl. ¶ 13.

Ms. Mangat began her conversation with Plaintiff by introducing herself, providing background information about Efinancial, and asking why Plaintiff was looking for life insurance. Dkt. 28, Gonslaves Decl., Ex. A, Tr. 4:18-6:11. Plaintiff responded that he was "concerned about . . . expenses, and you, know, taking care of everything." *Id.*, Tr. 6:12-15. Ms. Mangat and Plaintiff then discussed his children, whether he had any other assets that would pass to his beneficiaries, and his mortgage. *Id.*, Tr. 6:16-8:22. Next, Ms. Mangat asked Plaintiff a series of questions related to criminal and medical history, including:

- Whether he had used any form of tobacco or nicotine in the past two years;
- Whether he had any moving violations, DUIs, or reckless driving charges in the past five years;
- Whether his driving license had ever been revoked or suspended;
- Whether he had been treated for any drug or alcohol abuse;
- Whether he had been convicted of a felony;
- Whether he had ever declared bankruptcy;
- Whether he had any dangerous hobbies;
- What he did for a living and his household income;
- Whether he had ever been treated for high blood pressure or cholesterol;
- Whether he ever had cancer, diabetes, heart disease, stroke, or heart attack;
- Whether he had ever been treated for depression or anxiety;
- Whether he had ever been treated for sleep apnea or COPD;
- Whether he had ever been treated for epilepsy or any other respiratory or health issues;
- Whether he had been prescribed any medications in the past five years;
- Whether he had any health issues that he has seen a doctor for in the past ten years;
- Whether he had any upcoming test, treatments, or surgeries; and
- Whether he had been hospitalized in the past two years.

Dkt. 28, Gonslaves Decl., Ex. A, Tr. 9:12-13:23.

Plaintiff answered all of the questions and in response to some, provided very specific and detailed health information. Plaintiff did not object to this line of questioning and did not contend that Efinancial did not have his consent to call him. *See id*., Dkt. 28, Gonslaves Decl., Ex. A. Ms. Mangat then generated a quote and told Plaintiff they could submit his application,

and she would call him back the next day to let him know if he was approved. *Id.*, Tr. 15:8-16:8. Ms. Mangat asked Plaintiff for his legal name, which he provided, and confirmed his address. *Id.*, Tr. 16:13-22.

When Ms. Mangat asked for Plaintiff's driver's license number, Plaintiff began asking questions about her name, her telephone number, and the insurance company offering the quote, Fidelity Life. Dkt. 28, Gonslaves Decl., Ex. A, Tr. 18:1-21:15. Plaintiff asked whether Ms. Mangat had heard of a company called Accuquote and then told her that he was "concerned about the phone call" because his "number is on the do not call list." *Id.*, Tr. 21:16-24:12. Plaintiff then questioned Ms. Mangat as follows:

> MR. JOHANSEN: Let me slow you down a little bit. Mostly, Tina, I'm concerned about the phone call.
>
> MS. MANGAT: Uh-huh.
>
> MR. JOHANSEN: My number is -- My number is on the do not call list.
>
> MS. MANGAT: Uh-huh.
>
> MR. JOHANSEN: And I guess I'm concerned that I didn't give you consent to call me.
>
> MS. MANGAT: Okay. Did you put in a request somewhere?
>
> MR. JOHANSEN: No. Where did you get my information?
>
> MS. MANGAT: Did you go online and request a quote?
>
> MR. JOHANSEN: No. Where did you get my information?
>
> MS. MANGAT: Online. It's usually when people request a quote or something like that.
>
> MR. JOHANSEN: Okay. Where did you get my information?
>
> MS. MANGAT: I don't know. You -- I -- It just showed up. Did you have anything to do with Progressive?

REPORT AND RECOMMENDATION - 11

1   MR. JOHANSEN: No…Let me rephrase my question, Tina, and make it easier
2   for you. Who supplied my lead to you?

3   MS. MANGAT: It's not showing up. We get it from various -- various places…

4   MR. JOHANSEN: Okay. Can you give me a contact within eFinancial so that I
    can do the right thing here? Or I mean, I can -- I can communicate with you but
5   eventually you're going to have to

6   MS. MANGAT: Right, move you. You can probably reach out to the number on
    the website.

7   MR. JOHANSEN: Is there an eFinancial website?

8   MS. MANGAT: Yes. And I can put on our do not call list. Okay?

9   MR. JOHANSEN: Oh, please do that for sure.

10  Dkt. 28, Ex. A, Tr. 24:18-27:9.

11         Plaintiff was placed on Efinancial's DNC list, and Efinancial has not since called Plaintiff

12  for purposes of a providing a life insurance quote. Dkt. 25, Boisseau Decl., ¶ 45.

13         Portions of an email string produced by Plaintiff reflect that Plaintiff made a request to

14  Efinancial for the "lead submission information," and that information was provided to him on

15  April 30, 2020. Dkt. 36, Ex. 2. On May 21, 2020, Plaintiff responded with an email entitled

16  "Letter of Intent to File a Telephone Consumer Protection Act Claim", stating in relevant part:

17         Thank you for providing the consent data you have related to my telephone
           number. The data you provided confirms that I could not have been responsible
18         for the data entry. The IP address is a Google ISP located in Mountain View,
           California. I have no connection with Google and have not recently been in
19         California. The Last Name is misspelled "Johanson". The "dob", the "height" and
           the "weight" data are not even close. You initiated a telephone call to me one
20         minute after the data was received by your system. I did not provide my consent
           to your company to make telemarketing calls to me….

21  Dkt. 36, Ex. 2, p. 2.

22                                SUMMARY JUDGMENT STANDARD

23         Summary judgment is appropriate when, viewing the facts in the light most favorable to

REPORT AND RECOMMENDATION - 12

the nonmoving party, there is no genuine dispute as to any material fact that would preclude the entry of judgment as a matter of law. *Addisu v. Fred Meyer, Inc*., 198 F.3d 1130, 1134 (9th Cir.2000). The party seeking summary dismissal of a claim "bears the initial responsibility of informing the district court of the basis for its motion" (*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) and identifying those portions of the materials in the record that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)(1)).

Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp*., 477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient:" the opposing party must present probative evidence in support of its claim or defense. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir.2001); *Intel Corp. v. Hartford Accident & Indem. Co*., 952 F.2d 1551, 1558 (9th Cir.1991). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co*., 68 F.3d 1216, 1221 (9th Cir.1995).

<u>DISCUSSION</u>

The TCPA creates a cause of action for a person who receives more than one telephone call within a 12-month period in violation of the corresponding regulations. 47 U.S.C. § 227(c). The regulation prohibits telephone solicitations to residential telephone subscribers who have registered their phone numbers on the National DNC Registry. 47 C.F.R. § 64.1200(c)(2).

A.      <u>Prior Invitation or Permission</u>

Even if a telephone subscriber has registered his telephone number on the National DNC Registry, the caller will not be subject to liability if it first obtained "the subscriber's prior

express invitation or permission" that is "evidenced by a signed, written agreement between the

consumer and seller which states that the consumer agrees to be contacted by this seller and

includes the telephone number to which the calls may be placed." 47 C.F.R. § 64.1200(c)(2)(ii).

"The plain language of the TCPA shows that 'express consent' and 'express invitation or

permission' are interchangeable." *Physicians Healthsource, Inc. v. Cephalon, Inc*., 954 F.3d 615,

621 (3d Cir. 2020).

It is the FCC has determined that the signed, written agreement requirement may be fulfilled

by submission of a website form. *See* Rules & Regulations Implementing the TCPA of 1991,

C.G. Dkt. No. 02-278, Report and Order, 27 FCC Rcd 1830, 1844 (2012). Applying this

guidance, courts have found that a person can provide prior express permission by submitting a

web form with personal information when the web form includes a notice that the person agrees

to be contacted. *Morris v. Modernize, Inc*., No. AU-17-CA-00963-SS, 2018 WL 7076744, at *6-

8 (W.D. Tex. Sept. 27, 2018).

It is undisputed that Efinancial received Plaintiff's name and telephone number from a

submission on Efinancial's website https://feprogressive.efinancial.com. Dkt. 25, Boisseau Decl.

¶¶ 29-31; *id.*, Ex. A. The notice on this website, which is directly below the button used to

submit information, clearly states that by submitting information to request a life insurance

quote, the person "consent[s] to receive offers of insurance from Efinancial, LLC at the . . .

telephone numbers you provided . . . ." *Id.*, Bossieau Decl., ¶ 35. The submission received by

Efinancial includes data indicating that Plaintiff provided consent to be called, emailed, and to

receive SMS and MMS messages. *Id.*, ¶ 36; Boisseau Decl., Ex. A.

In his declaration, Plaintiff states "[a]ll of the statements I made [in the transcript]

regarding the fact that I did not visit the website inquired about during the call were accurate."

Dkt. 37, ¶ 11. During his discussion with Ms. Mangat, Plaintiff stated that he did not go online and request a quote. Dkt. 28, Ex. A, Tr. 24:18-27:9. However, Plaintiff's behavior during the April 7, 2020 telephone call indicates that he did consent to be called. When Plaintiff answered the call, Mr. Zamora immediately identified himself as calling from Efinancial "in response to the life insurance request that you submitted." *Id.*, Tr. 2:1-7. Thus, Plaintiff knew that it was a representative from Efinancial who was calling "in response" to Plaintiff's request. If Plaintiff did not submit the "life insurance request," he could have said so at that point and ended the call. Instead, Plaintiff engaged in conversations with Mr. Zamora and Ms. Mangat for almost 27 minutes and during these conversations, Plaintiff discussed very personal details about his background and health. Dkt. 25, Boisseau Decl., ¶ 42. In addition to confirming the personal information submitted online, Plaintiff provided the Efinancial representatives with his home address, information about his mortgage, income, and children (*see* Dkt. 28, Ex. A, Tr. 3:9-10; 6:16-8:15; 11:21-23); and information about tobacco use, moving violations, criminal convictions, medical diagnoses, medical treatments, and hospitalizations. *Id.,* Tr. 9:12-13:23.

Plaintiff argues that there is "nothing wrong with a consumer advocate posing as an interested customer"; that in essence, he was acting as a private attorney general; and, during the telephone call, he was "investigating" the "caller … to determine the sources and basis for the call…." Dkt. 36 at 7. Significantly, Plaintiff makes no mention in his declaration that he was posing as an interested customer after receiving a call that he did not request. Moreover, the transcript reflects that Plaintiff had no need to investigate source of the caller because the Efinancial representative immediately identified himself as calling from Efinancial. Plaintiff also provides no explanation for why he engaged in a lengthy discussion with two Efinancial representatives and why Plaintiff provided so much personal information. The provision of this

1  information was not necessary to conduct any "investigation," and there was no reasonable basis

2  for Plaintiff to provide this very private information other than a genuine interest in obtaining a

3  life insurance quote. In fact, it was not until Ms. Mangat provided an insurance quote, that

4  Plaintiff first claimed he had not consented to be called. Dkt. 28, Gonslaves Decl., Ex. A, Tr.

5  15:15-25:1.

6         Plaintiff attests to the accuracy of his prior claim that he did not visit Efinancial's website

7  but provides no facts or supporting evidence, *i.e.*, the internet browser history for his computer

8  and/or other devices for April 6, 2020, or other information regarding his whereabouts or

9  activities to show that it was impossible for him to have submitted the online form. Instead,

10 Plaintiff speculates that someone else submitted his information online. First, he claims that the

11 IP address for the request submission is located in California and reflects Google as the internet

12 service provider, while Plaintiff lives in Ohio and claims he does use Google. It is, however,

13 recognized that IP addresses can be unreliable indicators of physical location. *See*, *e.g.*,

14 *Commonwealth v. Molina*, 71 N.E.3d 117, 126 (Mass. 2017) (finding that an IP address alone is

15 too unreliable to support probable cause); *see also* A. Mackey, S. Schoen, & C. Cohn, Unreliable

16 Informants: IP Addresses, Digital Tips and Police Raids, ELECTRONIC FRONTIER

17 FOUNDATION (Sept. 2016), at 8-10,[5] (explaining "why IP addresses alone are not always

18 location proxies"); *Molina*, 71 N.E.3d at 122 n.2 ("An IP address does not identify an exact

19 physical location, only an electronic destination on the Internet."). Indeed, while Plaintiff claims

20 that the IP address associated with his request is located in California, various publicly available

21

22

23

---

[5] *See* https://www.eff.org/files/2016/09/22/2016.09.20_final_ formatted_ip_address_white_ paper_0.pdf

REPORT AND RECOMMENDATION - 16

websites list the IP address as being located in North Charleston, South Carolina.[6] As noted by EFinancial, this evidence simply underscores the unreliability of IP addresses and provides no meaningful information about who submitted the online form for a life insurance quote.

Plaintiff next notes that "the IP address appears on a list of public proxies posted on the *same day* of the purported opt in on a website thread in the Philippines related to technology and computer hacking." Dkt. 36 at 13 (emphasis in original). To the extent Plaintiff is speculating that a hacker submitted the life insurance quote request, "mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996). It is also entirely unclear why a hacker would want to pose as Plaintiff simply to obtain an insurance quote.

Plaintiff also claims that the date of birth, height, and weight provided to Efinancial are inaccurate. However, as explained by Ms. Boisseau, height and weight, among other data points, are temporarily auto-populated when a customer submits a request for a life insurance quote. Dkt. 25, Boissau Decl., ¶ 34. The height and weight are admittedly not Plaintiff's height and weight and are not probative of whether Plaintiff entered the online request.

Finally, Plaintiff claims that he has never heard of the email address that was provided with his request, *i.e.*, domiallender@aol.com. A simple Google search of the email address performed by Efinancial reveals that it is associated with a person named John A. Johansen, who is associated with the exact same address that Plaintiff provided to Efinancial during the April 7, 2020 call.[7] EFinancial also found another publicly available website that links a John A. Johansen to Plaintiff's phone number and address and lists "Kenneth W. Johansen" as a possible

---

[6] *See* https://www.ip-adress.com/ip-address/ipv4 /34.73.42.211; https://whatismyipaddress.com/ip/ 34.73.42.211.1

[7] *See* 2 https://thatsthem.com/name/John-A-Johansen

1    relative.[8]

2          According to Efinancial, this is not the first time Plaintiff has engaged in this type of

3    "bait-and-switch" behavior and has in fact, filed at least 39 other TCPA cases in the last six

4    years. In one of those lawsuits, Plaintiff admitted that he had no desire to enroll in the company's

5    services "but played along 'as he typically does.'" The district court in that case found that

6    Plaintiff's "deceptive conduct gave [the defendant] an objectively reasonable basis for believing

7    that [plaintiff] had established a business relationship with [defendant]. *Johansen v. Nat'l Gas &*

8    *Elec. LLC*, No. 2:17-cv-587, 2018 WL 3933472 (S.D. Ohio Aug. 16, 2018). Similarly, if Plaintiff

9    had no intention of obtaining an insurance quote from EFinancial, the undersigned concludes that

10    his deceptive behavior during the telephone call reflected otherwise.

11          When the non-moving party fails to produce enough evidence to create a genuine issue of

12    material fact, as Plaintiff has done here, summary judgment in favor of the moving party is

13    warranted. *United States v. Elmore*, No. C05-0810JLR, 917 F.3d 1068, *13 (W.D. Wash. July

14    12, 2012). In light of the evidence presented, the undersigned concludes that no reasonable jury

15    could find that someone other than Plaintiff submitted the online request to obtain a life

16    insurance quote and provided consent to be called. As such, no genuine issue of material fact

17    exists and it is recommended that summary judgment be entered in favor of Efinancial.

18    B.    <u>TCPA Safe Harbor Provision</u>

19          Alternatively, Efinancial contends that summary judgment is warranted because the

20    TCPA's safe harbor defense applies.

21

22

23    ───────────────

[8] See https://www.truepeoplesearch.com/details?name=John%20Johansen&citystatezip
=Dublin%2C%20OH&rid=0x0.

The TCPA provides that "[i]t shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). If an entity has violated the TCPA, it can avoid liability if the call was placed in error and that "as part of its routine business practice," it meets various standards, which are discussed in more detail below. 47 C.F.R. § 64.1200(c)(2)(i).

### 1.    The Telephone Call Was in Error

Assuming Plaintiff did not submit the online request for an insurance quote, Efinancial argues that the safe harbor defense applies because it called Plaintiff in error and it complies with the safe harbor provisions. Plaintiff argues that the safe harbor defense does not apply in situations where Efinancial intentionally directed the telephone call to Plaintiff without regard to whether his telephone number was registered on the National DNC Registry and whether his telephone number was or should have been registered in Efinancial's internal DNC list. Plaintiff also argues that even if the telephone call can be construed as having been made in error, Efinancial has failed to demonstrate that it meets the required regulatory standards.

The first requirement of the safe harbor provision is that the call was placed in error. "A party can support a claim of error by showing that the telephone solicitation was made unintentionally." *Simmons v. Charter Commc'ns, Inc.*, 222 F. Supp. 3d 121, 135 (D. Conn. 2016), aff'd, 686 F. App'x 48 (2d Cir. 2017). "An error claim should be supported by evidence showing that otherwise unlawful telephone solicitations were made unintentionally and detailing any procedural breakdowns that led to such calls." *Dynasty Mortgage, LLC, Notice of Apparent Liability for Forfeiture*, 20 FCC Rcd 4921, 4929 (2005). Nevertheless, "it is not clear that

procedural breakdown is the *sine qua non* of the safe harbor provision." *Simmons*, 222 F. Supp.
3d at 135. As such, courts are left with "[u]sing the ordinary definition of the word 'error,'"
which "is in line with the TCPA's goal of encouraging the use of 'reasonable practices and
procedures.'" *Id*. At least one court has relied on the definition of "error" found in Black's Law
Dictionary, which is "[a]n assertion or belief that does not conform to objective reality; a belief
that what is false is true or that what is true is false; [a] mistake." *Id*.

Plaintiff points to several cases that stand for the proposition that there is no good-faith
defense to TCPA liability. Dkt. 36 at 12-13. Efinancial is not arguing a good-faith defense;
instead, it contends that its call to Plaintiff was based on the mistaken but reasonable belief that
Plaintiff provided consent to be called, thus qualifying it for the safe harbor defense. *See, e.g., N.
L. v. Credit One Bank, N.A*., 960 F.3d 1164, 1170 (9th Cir. 2020) (noting that safe harbor
defenses are necessary because intent cannot defeat TCPA liability).

Plaintiff also argues that no court has found a factual circumstance such as this one to
amount to a safe harbor defense. However, the lack of occasion for courts to consider the
application of the safe harbor defense does not mean that it does not apply here. Plaintiff further
argues that if the Court were to find that Efinancial's call to Plaintiff was in error, then every
defendant would be able to avoid TCPA liability by claiming it had permission to contact the
plaintiff. This theory does not make sense under the circumstances presented. There is no
evidence that Efinancial assumed, without reason, that Plaintiff consented to be called. Instead,
the evidence reflects that Efinancial's internal processes ensure that it will not receive this
information if consent is not first provided. *See* Dkt. 25, Boisseau Decl., ¶¶ 19-23. Thus,
Efinancial could reasonably believe that Plaintiff submitted the form on its website and
consented to be called because it received verified information online which purported to be

1    from and about Plaintiff. *See id.*, ¶¶ 18-22. Moreover, during almost the entire April 7, 2020

2    telephone call, Plaintiff led Mr. Zamora and Ms. Mangat to believe that he submitted the request,

3    consented to be called, and was interested in obtaining a life insurance policy.

4         If in fact, the person who submitted the form and consent to be called was a hacker, as

5    Plaintiff suggests, then Efinancial would be understandably mistaken in its belief that Plaintiff

6    had consented to the call. If Plaintiff did not submit the online form – despite all evidence to the

7    contrary – then Efinancial's telephone calls to Plaintiff were in error. This satisfies the first

8    requirement of the safe harbor provision.

9         2.    Regulatory Requirements

10        Additionally, Efinancial has provided evidence that, as part of its routine business

11   practice, it complies with the standards required by the safe harbor provision, *i.e.*, (1) "written

12   procedures to comply with the national do-not-call rules;" (2) training of personnel on those

13   procedures; (3) maintenance of a list of phone numbers that the entity cannot contact; (4) the use

14   of "a process to prevent telephone solicitations to any telephone number on any list established

15   pursuant to the do-not-call rules;" and (5) the use of "a process to ensure that it does not sell,

16   rent, lease, purchase or use the national do-not-call database, or any part thereof, for any purpose

17   except compliance with this section and any such state or federal law to prevent telephone

18   solicitations to telephone numbers registered on the national database." 47 C.F.R. §

19   64.1200(c)(2)(i)(A)-(E); *see also Mattson v. New Penn Fin.*, No. 3:18-cv-00990-YY, 2020 U.S.

20   Dist. LEXIS 197955, at *13 (D. Or. Oct. 25, 2020) (listing these requirements for establishing

21   the safe harbor defense). Efinancial details its compliance with these regulatory standards in its

22   motion. *See* Dkt. 24, 22-25. Plaintiff takes issue with just two of the standards: maintenance of

23   an internal do-not-call list and the purchase and access of the National DNC Registry.

1        1.      Internal Do-Not-Call List

2        Plaintiff argues that there is a dispute as to whether Efinancial maintains an internal do-

3    not-call list because Plaintiff received calls from Efinancial after requesting to be placed on

4    Efinancial's do-not-call list in 2015. The undersigned does not find the existence of a material

5    issue of dispute.

6        As previously noted, the summary judgment reflects that Efinancial maintains an internal

7    do-not-call list (*see* Dkt. 25, Boisseau Decl. ¶¶ 14-16) and there is no evidence that Plaintiff

8    received any calls from Efinancial until April 7, 2020 – and that call was triggered by the online

9    written consent from Plaintiff (or someone purporting to be Plaintiff). The consent received by

10   Efinancial for that telephone call negated any need for it to check its internal do-not-call list.

11   Additionally, Efinancial placed Plaintiff on its do-not-call list immediately at the end of his

12   conversation with Ms. Mangat on April 7, 2020.

13       2.      Purchase of the National DNC Registry

14       Plaintiff also argues that the safe harbor defense is unavailable to Efinancial because it

15   did not proffer evidence to show that Efinancial has purchased and accessed the National DNC

16   Registry. Efinancial acknowledges that the regulation references the purchase of and access to

17   the National DNC Registry, but urges application of the safe harbor defense here because it

18   substantially complies with the regulation in a manner that fulfills the TCPA's purpose. The

19   undersigned agrees.

20       "Substantial compliance with regulatory requirements may suffice when such

21   requirements are procedural and when the essential statutory purposes have been fulfilled."

22   *Shotgun Delivery, Inc. v. United States*, 269 F.3d 969, 973-74 (9th Cir. 2001); *see also Sawyer v.*

23   *Cnty. of Sonoma*, 719 F.2d 1001, 1008 (9th Cir. 1983) ("[T]he doctrine can be applied only

where invocation thereof would not defeat the policies of the underlying statutory provisions.").

Efinancial has proffered evidence that it has established procedures that fulfill the TCPA's purpose – it only calls customers who provide consent to be called; it trains its personnel on do-not-call procedures; and it maintains an internal do-not-call list. These practices ensure that Efinancial fulfills the TCPA's purpose: "to protect consumers from the unwanted intrusion and nuisance of unsolicited telemarketing phone calls and fax advertisements." *Van Patten v. Vertical Fitness Grp.*, 847 F.3d 1037, 1043 (9th Cir. 2017). Because Efinancial calls only those customers who have requested a life insurance quote and consented to be called, it does not need to access the National DNC Registry. Based on this evidence, the undersigned concludes that Efinancial's internal processes comport with the spirit of the TCPA and its implementing regulations, and Efinancial's processes and procedures fulfill the TCPA's essential statutory purpose of preventing unsolicited phone calls.

Plaintiff also argues that Efinancial *should* have known that he was not the one who submitted the request and provided consent. Accepting this theory of liability puts Efinancial and other similar companies who require consent to be contacted in an untenable position as they would no longer be able to rely on any consent that they receive from customers who actually want to be contacted. Such a result is not required by the TCPA. *See e.g.,* Congressional Statement of Findings, § 2 of Pub. L. 102-243 (Dec. 20, 1991) ("Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices."); In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 FCC Rcd. 8752, 8754 (F.C.C. Sept. 17, 1992) (FCC acknowledgment that its task was "to implement the TCPA in a way that reasonably accommodates individuals' rights to privacy as

well as the legitimate business interests of telemarketers.").

## CONCLUSION

Efinancial is entitled to summary judgment on Plaintiff's TCPA claims because the competent summary judgment evidence reflects that Plaintiff consented to being called by Efinancial on April 7, 2020. Alternatively, Efinancial is entitled to summary judgment because it is entitled to TCPA's safe harbor provision.

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **June 28, 2021**. The Clerk should note the matter for **June 30, 2021**, as ready for the District Judge's consideration if no objection is filed.  If objections are filed, any response is due within 14 days after being served with the objections.  A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served.  The matter will then be ready for the Court's consideration on the date the response is due.  Objections and responses shall not exceed six (6) pages.  The failure to timely object may affect the right to appeal.

DATED this 11th day of June, 2021.

_____
BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 24